**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE BANK OF NEW YORK,            ) | |
|                                       ) | |
|                 **Plaintiff,**     ) | |
|                                         ) | |
|             **v.**                  ) | **Civil Action No. 03-1221 (ESH)** |
|                                         ) | |
| FEDERAL DEPOSIT INSURANCE   ) | |
| COMPANY,                                  ) | |
|                                         ) | |
|             **Defendant.**     ) | |
| _____ ) | |

## MEMORANDUM OPINION

The Bank of New York ("BNY"), indenture trustee for the interests of investors who purchased asset-backed securities from a trust established by the now-defunct NextBank, N.A. ("NextBank"), is suing the Federal Deposit Insurance Corporation ("FDIC") for conversion based on actions the agency took as NextBank's receiver. Five of BNY's original six counts have been dismissed. Count VI, the sole remaining claim, concerns a contract provision promising the investors ("Noteholders") recovery of their investments at an accelerated rate upon the appointment of a receiver for NextBank. BNY contends that, in declining to honor this early amortization or "ipso facto" clause, the FDIC acted without authority under the Financial Institutions Reform Recovery and Enforcement Act of 1989 (FIRREA), Pub. L. No. 101-73, 103 Stat. 183.

The issue before the Court is one of first impression. Essentially, BNY argues that the structure of the NextBank securitization transaction was crafted so that NextBank was not a party to the contract (the "Master Indenture") containing the ipso facto clause and that, as a result, the

FDIC exceeded its powers under 12 U.S.C. § 1821(e)(12)(A)[1]– –and thereby converted millions

of dollars belonging to the Noteholders– –when it refused to honor the ipso facto clause upon

NextBank's failure.  The FDIC counters that BNY's securitization transaction is not immune

from the FDIC's statutory powers providing that the FDIC as receiver may exercise its power to

enforce an agreement notwithstanding an early amortization clause triggered by the appointment

of a receiver, because NextBank "entered into" the agreement within the meaning of Section

1821(e)(12)(A).  For the reasons set forth herein, the Court concludes that the early amortization

clause is unenforceable against the FDIC and that, therefore, judgment will be entered for the

FDIC on Count VI.[2]

## BACKGROUND

### I.    NextBank and the Parties

NextBank was a national banking association established in 1999 to issue consumer

credit cards, primarily through the internet.  (Pl.'s Mot. for J. as to Liability ["Pl.'s Mot."] Ex. A

at 4, 11.)  By February 2002, NextBank had 1.2 million credit card holders and accounts totaling

approximately $1.9 billion.  (Christensen Decl. Ex. 3 ["Ltr. 2/12/02"] at 1187; Wigand Dep. Ex.

4 at 2.)

NextBank maintained the vast majority of its accounts– –approximately $1.7 billion– –in

---

[1]In 2005, Congress renumbered Section 1821(e)(12)(A).  *See* Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, §§ 902, 904, 119 Stat. 23,
159, 165 (renumbering the provision as Section 1821(e)(13)(A)).  For the sake of consistency
with the record, this Memorandum Opinion refers to the provision as Section 1821(e)(12)(A).

[2]The parties have filed cross-motions for judgment under Federal Rule of Civil Procedure
52(a).  Therefore, this Memorandum Opinion will constitute the Court's "findings of fact and
conclusions of law."  Fed. R. Civ. P. 52(a).

a "securitized" portfolio. (*Id.*)  In other words, instead of financing this portfolio with money borrowed in its own name, NextBank created a trust, transferred its receivables to this trust, ordered the trust to sell notes to investors, and used the proceeds to pay merchants for charges by credit card holders. (Def.'s Statement of Material Facts ["Def.'s Stmt."] ¶ 5; *see, e.g.*, Christensen Decl. Ex. 1 ["Offering Mem. 12/6/00"] at 390–91 (highlighting information about the trust for prospective investors).)  Generally accepted accounting principles permitted NextBank to remove the securitized accounts from its balance sheets. (Pl.'s Mot. Ex. B at 6.)  By doing so, NextBank was able to reduce its required capital reserves. (*See id.*)

The FDIC learned in September or October of 2001 that NextBank's undercapitalization and practice of extending credit to subprime borrowers had put the bank at risk for failure. (*See* Wigand Dep. at 20:7–8; Pl.'s Mot. Ex. A at 5–8.)  In late 2001, the Office of the Comptroller of the Currency ("OCC") determined that NextBank was improperly accounting for poor credit quality on delinquent accounts. (*See id.*)  On February 7, 2002, the OCC appointed the FDIC to become NextBank's receiver. (*See id.* Ex. A at 46.)  As receiver, the FDIC succeeded to "all [NextBank's] rights, titles, powers, and privileges." 12 U.S.C. § 1821(d)(2)(A)(I) (2006). Further, the FDIC's appointment obligated it to "preserve and conserve [NextBank's] assets and property." *Id.* § 1821(d)(2)(B)(iv).

BNY is the indenture trustee for the trust NextBank established to securitize its accounts. (Christensen Decl. Ex. 4 ["MI"] at 140, 205.)  As indenture trustee, BNY represents the interests of the Noteholders, who are large, institutional investors, including Credit Suisse, Goldman Sachs, J.P. Morgan, Deutsche Bank, and Barclays Capital. (*Id.* Ex. 2 ["Offering Mem. 4/20/01"] at 937–38; Offering Mem. 12/6/00 at 460–61, 593; *see* Wigand Dep. Ex. 4 at 3.)

II.     **Principles and Benefits of Securitization**

In order to address the parties' dispute, one must first have a basic understanding of

NextBank's method of financing.  "Securitization has grown from an emerging practice

involving mortgage receivables more than 25 years ago to one of the most widely used forms of

commercial funding across a broad range of businesses, both in the U.S. and worldwide."  (Pl.'s

Mot. Ex. B at 6.)  Although securitization can take various forms, most securitization

arrangements involve certain basic players: a "transferor," the initial owner of the assets; a

"special purpose vehicle" ("SPV"), which the transferor creates to purchase and hold the assets;

and investors, who purchase securities issued by the SPV.  (*Id.* Ex. B at 6, 9.)

A key principle underlying securitization is that quantifying the creditworthiness of

pooled assets is often easier than quantifying the creditworthiness of the assets' owner.  (*Id.*)

Ease and accuracy of quantification makes it possible to bundle asset-backed securities for sale in

classes, or "tranches," calibrated to varying investor preferences for income and risk.  (*See id.* Ex.

B(5) at 4 n.2.)  Both investors and transferors benefit as a consequence.  Investors can insulate

themselves from the difficult-to-quantify risks of a transferor's business and make investments

suited to their individual preferences for income and risk.  (*See id.* Ex. B at 9; *id.* Ex. B(5) at 4

n.2.)  Transferors can procure lower-cost financing and access to capital from institutional

investors who might, absent securitization, be unable or unwilling to purchase the transferors'

assets.  (*Id.* Ex. B(5) at 3–4.)

A second important principle of securitization is the "legal isolation" of assets from their

transferors.  (*Id.* Ex. B(5) at 2, 4.)  As defined by the Financial Accounting Standards Board

("FASB"), legal isolation means that an asset is "presumptively beyond the reach of the

transferor and its creditors, even in bankruptcy or other receivership." (*Id.* Ex. B(5) at 1 (quoting

Fin. Accounting Standards Bd., Statement of Financial Accounting Standards No. 125,

*Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities* 4

(1996), *available at* http://www.fasb.org/pdf/fas125.pdf).)  Because the FASB's generally

accepted accounting principles do not permit transferors to remove assets from their balance

sheets absent legal isolation, legal isolation makes possible one of securitization's notable

benefits for transferors--the ability to reduce their required capital reserves. (*Id.* Ex. B(5) at 1–3;

*see* Pl.'s Mem. in Supp. at 2 ("The separation between NextBank and the Trust allowed

NextBank to receive favorable accounting and regulatory treatment . . . .").)

## III.    Securitization of NextBank's Receivables

### A.    The Transaction Documents

All securitizations are based on documents that define the duties and obligations that

transferors, SPVs, and investors owe one another. (Pl.'s Mot. Ex. B at 9.)  NextBank securitized

its assets using several interrelated "transaction documents."  These included a "Trust

Agreement" (Christensen Decl. Ex. 6 ["Trust"] at 1–28), an "Administration Agreement" (*id.* Ex.

7 ["Admin."] at 43–56), a "Transfer and Servicing Agreement" (*id.* Ex. 10 ["T&S"] at 58–115),

and the Master Indenture (MI at 138–207).[3]

In the Trust Agreement, dated December 1, 2000, NextBank created a trust to hold its

credit card receivables and repay the Noteholders. (Trust at 1; Def.'s Stmt. ¶ 16.)  The Trust

---

[3]The Court adopts the term "transaction documents" from the Trust Agreement and the
Master Indenture. (*See, e.g.*, Trust at 15 (using the term in §§ 5.02 and 5.03); MI at 152 (defining
the term).)  Elsewhere in the record, the documents are sometimes referred to as "the related
agreements" or simply "the documents." (*See, e.g.*, Christensen Decl. Ex. 11 at 1038
(documents); Admin. at 45 (related agreements).)

Agreement designated NextBank the "owner" of the trust and, as such, accorded NextBank an "undivided beneficial interest" in the trust's assets.  (*Id.*)  Because NextBank owned the trust, the Trust Agreement provided that, "for income tax purposes, the [t]rust [would] be treated as a security device and disregarded as an entity."  (Trust at 4.)

The trust depended on NextBank for its operation, because it lacked employees or infrastructure of its own.  (Def.'s Stmt. ¶ 16.)  The Administration Agreement, dated December 1, 2000, made NextBank responsible for carrying out the trust's duties under the other transaction documents.  (Pl.'s  Statement of Undisputed Facts ["Pl.'s Stmt."] ¶ 22; *see* Admin. at 46–47.)

In the Master Indenture, dated December 11, 2000, the trust authorized the issuance and sale of notes secured by and paid from the credit card receivables transferred to the trust.  (MI at 138; Def.'s Stmt. ¶ 19.)  Terms specific to particular series of notes would be set forth in series-specific "indenture supplements."  (MI at 159.)

Notes issued by the trust would have three possible cash-flow periods.  (Def.'s Stmt. ¶ 11; *see* Offering Mem. 12/6/00 at 391.)  During an initial "revolving period," Noteholders would be paid only interest and no principal.  (*Id.*)  After the revolving period, there would be a "controlled amortization period" during which principal would be paid to Noteholders in fixed amounts at scheduled intervals.  (Def.'s Stmt. ¶ 13; *see* Offering Mem. 12/6/00 at 391–92.)  Finally, if there occurred a "redemption event" as defined in the Master Indenture, Noteholders would receive payments of principal and interest on an accelerated schedule defined in their indenture supplements.  (Def.'s Stmt. ¶ 14; *see* Offering Mem. 12/6/00 at 392.)

In particular, Article V, § 5.01 of the Master Indenture provided that, upon the

appointment of a conservator, receiver, or liquidator of NextBank, "a [r]edemption [e]vent with respect to all [s]eries of [n]otes [would immediately] occur without any notice or other action on the part of the Indenture Trustee or the Noteholders."  (MI at 173.)

The Transfer and Servicing Agreement, dated December 11, 2000, provided the procedure for transferring credit card receivables to the trust and servicing those receivables. (T&S at 58; Def.'s Stmt. ¶ 21.)  NextBank was both "transferor" and "servicer" under the agreement.  (T&S at 58.)  As transferor, NextBank was responsible for transferring receivables to the trust.  (*See id.* at 76.)  As servicer, it was responsible for collecting payments on the receivables, depositing those collections in an account, keeping track of which collections were finance-charge receivables and which were principal receivables, and allocating the collections received among the Noteholders and the transferor pursuant to the Master Indenture, indenture supplements, and the Transfer and Servicing Agreement itself.  (Def.'s Stmt. ¶ 21.)

All of the transaction documents shared certain common characteristics.  The documents repeatedly cross-referenced one another.  (*See, e.g.*, Trust at 8 (cross-referencing the Master Indenture and the Transfer and Servicing Agreement); Admin. at 45 (cross-referencing the Master Indenture, the Transfer and Servicing Agreement, and the Trust Agreement); MI at 166 (cross-referencing the Transfer and Servicing Agreement); T&S at 91 (cross-referencing the Trust Agreement).)  NextBank had obligations under all of the documents, including under the Master Indenture.  (*See, e.g.*, MI at 1205 (obligating NextBank to pay BNY).)  Notably, Next Bank signed all of the documents.  (*See* Trust at 1; Admin. at 43; MI at 138; T&S at 58.)

As BNY has emphasized, however, the Mater Indenture was distinguishable from the other transaction documents in certain significant respects.  Although NextBank signed the

Master Indenture, it did so in a special signature block labeled "acknowledged and accepted."

(MI at 1207.)[4]  By contrast, NextBank signed the other documents in an ordinary signature block

under a statement saying that "the parties" (or, in the case of the Transfer and Servicing

Agreement, "the Transferor, the Servicer and the Trust") had "caused the Agreement to be duly

executed."  (Trust at 28; Admin. at 56; T&S at 114.)  Also, whereas each of the other transaction

documents listed NextBank on its cover sheet, the only entities listed on the Master Indenture's

cover sheet were the trust and BNY.  (*Compare* Trust at 1, Admin. at 43, *and* T&S at 58, *with* MI

at 138.)

### B.      The Marketing of NextBank's Securitized Assets

In accordance with the four principal transaction documents (and relevant indenture

supplements), NextBank marketed notes in various series, the properties of which it described in

a standard "offering memorandum" and individualized "offering memorandum supplements" that

were circulated to all prospective buyers.  (Def.'s Stmt. ¶ 25.)  The offering memorandum

warned that, "[i]f a conservator or receiver were appointed for [NextBank], delays or deductions

in payment of [their] notes could occur."  (Offering Mem. 4/20/01 at 876; Offering Mem.

12/6/00 at 396.)  More specifically, the memorandum warned, "[T]he FDIC may have the power

. . . to prevent or require the commencement of an early amortization period."  (Offering Mem.

4/20/01 at 876; Offering Mem. 12/6/00 at 396.)

In addition to NextBank's offering memoranda, BNY and prospective buyers received

opinion letters from NextBank's outside counsel addressing whether BNY's interest in

---

[4]BNY also stresses that NextBank's board of directors authorized the trust– –not
NextBank itself– –to enter into the Master Indenture.  (Pl.'s Resp. at 15; *see* Pl.'s Mot. Ex. B(6)
at 4.)

receivables could be enforced against the FDIC as receiver.  (Def.'s Stmt. ¶ 25; *see, e.g.*, Christensen Decl. Ex. 11 at 1038 (explaining the purpose of one such opinion letter).)  In each of these letters, counsel warned that the proffered opinion depended on various assumptions.  (*See, e.g.*, *id.* ("We have assumed for purposes of this opinion, without investigation, that the following statements are correct.").)  Among the assumptions contained in a majority of the opinion letters was that NextBank had entered into the Master Indenture.  (*See, e.g.*, *id.* Ex. 11 at 1040 ("The Documents resulted from arm's-length bona fide negotiations among the parties thereto, and were entered into by the Bank in the ordinary course of its business."); *see also id.* Ex. 11 at 1039 (coining "Bank" as shorthand for NextBank and "Documents" as shorthand for "The Transfer Agreement, the Assignment, and the Master Indenture").)  A second assumption was that BNY would not attempt to foreclose on receivables solely because of the appointment of a receiver.  (*See, e.g.*, *id.* Ex. 11 at 1040 (listing as one of counsel's underlying assumptions that BNY "[would] not attempt to foreclose on the Receivables or the proceeds thereof after the appointment of the FDIC as conservator or receiver for [NextBank] . . . without the existence of an event of default other than the appointment of a conservator or receiver").)

Having received such warnings, the Noteholders whose interests BNY now represents purchased notes from "Series 2000-1" and "Series 2001-1."  (Def.'s Stmt. ¶ 8.)  Within each series, there were four classes of notes with differing levels of risk– –the lowest being Class A, and the highest Class D.  (*Id.*)  Class A notes had priority for repayment over Class B, Class B over Class C, and Class C over Class D.  (Offering Mem. 4/20/01 at 938; Offering Mem. 12/6/00 at 461.)  Thus, as reflected in ratings provided by Moody's, the purchasers of Class C or D notes accepted a significantly higher risk that they would not "receive required interest and principal

payments" as compared to the purchasers of Class A or B notes; therefore, the Class A notes

were rated "Aaa," the Class B Notes "A1," the Class C Notes "Baa2," and the Class D Notes

"Ba2." (Def.'s Stmt. ¶ 8; *see* Christensen Decl. Ex. 5 at 99 (listing the Moody's ratings for the

Series 2000-1 notes).) In return for accepting greater risk, Class C and D Noteholders earned

interest at higher rates. (*See, e.g.*, Offering Mem. 4/20/01 at 938 (showing an annual interest rate

of "one-month LIBOR plus 0.30%" for Class A notes, "one-month LIBOR plus 0.88%" for Class

B notes, "one-month LIBOR plus 1.60%" for Class C notes, and "one-month LIBOR plus

6.35%" for Class D notes).)

## IV.    NextBank's Receivership

In the two months preceding the FDIC's appointment as NextBank's receiver, the FDIC

worked on developing a resolution strategy least costly to the Deposit Insurance Fund.[5] (*See*

Wigand Dep. at 22:1–12, 56:18–21.) As part of this process, the FDIC considered the likely

effect of declining to honor the Master Indenture's ipso facto clause– –both on the Deposit

Insurance Fund and on the marketplace. (*See id.* at 55:3–61:19.) Ultimately, after the FDIC's

appointment as receiver on February 7, 2002, it chose not to honor the ipso facto clause,

concluding that the clause was unenforceable pursuant to FIRREA. (*See, e.g.*, Christensen Decl.

Ex. 17 ["Bd. Mins. 2/15/02"] at 1204; *id.* Ex. 12 ["Bd. Mins. 2/7/02"] at 1199–1200.) On that

date, the FDIC's board of directors authorized enforcement of the Master Indenture's regular

---

[5]The FDIC insures deposits out of a fund to which banks and savings associations contribute. *See* 12 U.S.C. § 1821(a). The fund is known as the "Deposit Insurance Fund." *See* Federal Deposit Insurance Reform Act of 2005, Pub. L. 109-171, 120 Stat. 9. As receiver, the FDIC is prohibited from taking any action that would increase losses to the Deposit Insurance Fund by protecting "creditors other than depositors." 12 U.S.C. § 1823(c)(4)(E)(i)(II); *see also id.* § 1823(c)(4)(A) and (B) (explaining the receiver's more general obligation to resolve failed banks in the manner least costly to the Deposit Insurance Fund).

repayment schedule notwithstanding the ipso facto clause.  (*See id.* at 1198–1200.)

On February 8, 2002, representatives of the FDIC met with representatives of BNY to inform them of the board's decision.  (Bd. Mins. 2/15/02 at 1204; Ltr. 2/12/02 at 1187.) Specifically, the FDIC informed BNY of its legal position that the early amortization trigger or ipso facto clause was "unenforceable under 12 U.S.C. § 1821(e)(12)(A)."  (*Id.* at 1188.)  The FDIC reiterated this position in a February 12, 2002, letter from its general counsel to BNY's senior counsel and the rating agencies.  (*See id.*)  Specifically, it informed BNY that it would maintain the status quo and continue to enforce the transaction documents to keep the credit card business functioning, declaring the ipso facto clause unenforceable under Section 1821(e)(12)(A).  (*See id.*)

BNY did not challenge the FDIC's position, and it wrote to the Noteholders on February 14, 2002, reminding them of the offering memoranda's prior warnings that "the FDIC may have the power to prevent the triggering of automatic default or acceleration provisions, such as the Early Amortization Period, regardless of the terms of the Transfer and Servicing Agreement, the Indenture, or the instructions of those authorized to direct the Indenture Trustee's actions."  (*E.g.*, Christensen Decl. Ex. 13 at 1191; *see* Bd. Mins. 2/15/02 at 1204–05.)

Also on February 14, 2002, the FDIC's general counsel issued a statement to assure the market that the FDIC's exercise of power was focused on the automatic acceleration provision and that the receiver was not repudiating the Master Indenture:

> The FDIC, as receiver for NextBank, N.A., has advised the Bank of New York, as Trustee for the NextCard Credit Card Master Trust, that an automatic event, default, acceleration or early amortization based solely on insolvency or appointment of the FDIC as receiver is not enforceable against the FDIC.  The FDIC has not indicated any question or doubt to the Trustee or otherwise regarding the validity or effect of any other trigger

events for an early amortization of any NextBank Credit Card Trust obligations, including any other such trigger events based on collateral performance.

      The FDIC reconfirms, under established FDIC policy as codified by express rule at 12 [C.F.R. §] 360.6, that it will not disaffirm or repudiate the completed transfer of financial assets by NextBank, N.A. in securitizations in accord with that FDIC rule.

**(**Christensen Decl. Ex. 16 at 3312.)

The same day, the FDIC sent BNY a letter clarifying the scope of its position.  (*See id.* Ex. 15 ["Ltr. 2/14/02"] at 1189.)  The FDIC further explained that, under Section 1821(e)(12)(A), "the FDIC as receiver [has] the authority to enforce contracts entered into by [a] depository institution in receivership notwithstanding any contract clause providing for termination, acceleration or default solely by reason of insolvency or the appointment of the receiver."  (*Id.*)  Thus, according to the FDIC, the provision in the Master Indenture requiring automatic acceleration by reason of the appointment of a receiver was "in direct contravention of FIRREA."  (*Id.*)

Thereafter, at a meeting of the FDIC board of directors on February 15, 2002, the board noted that the FDIC receiver had informed BNY "that the [FDIC receiver] had the authority through [FIRREA] to avoid or declare unenforceable the early amortization trigger, which the Trustee does not appear to challenge."  (Bd. Mins. 2/15/02 at 1204–05.)

Having declined to honor the Master Indenture's ipso facto clause, the FDIC continued to use the Noteholders' capital for several months to pay merchants for new purchases by NextBank credit card holders.  (Wigand Dep. Ex. 13 at 1493; *see* Pl.'s Stmt. ¶ 5; Def.'s Stmt. ¶ 45.)  During this period, the FDIC continued to make principal and interest payments to Noteholders according to the applicable nonaccelerated schedule.  (*See* Christensen Decl. Ex. 13 at 1191; *id.* Ex. 14 at 1193; Wigand Dep. Ex. 13 at 1493.)

On July 10, 2002, the FDIC notified BNY that NextBank's securitized credit card portfolio had failed to meet a financial performance threshold, which triggered early amortization under the Master Indenture independently of the ipso facto clause. (Def.'s Stmt. ¶ 45.) As soon as early amortization began, the FDIC closed the credit card accounts by prohibiting credit card holders from making new charges. (*Id.*)

While credit card holders paid down their existing balances, the FDIC continued to pay all Noteholders monthly interest. (Def.'s Stmt. ¶ 47.) The Class A and B Noteholders were fully repaid both principal and interest. (*Id.*; *see* Raburn Dep. Ex. 7-10 at 10932.) Although the Class C and D Noteholders have continued to receive all interest, the Class C Noteholders were repaid only half their principal and the Class D Noteholders were not repaid any principal. (Def.'s Stmt. ¶ 47.) Accordingly, the interests of the Class C and D Noteholders– –the most risk-preferring Noteholders– –are at issue in the present case.

## V.   Procedural History

Almost a year after early amortization began, BNY filed its complaint on June 6, 2003, against the FDIC, alleging six counts of conversion. The case was initially assigned to Judge Thomas Penfield Jackson but, upon his retirement, it was reassigned to this Court. Following a motions hearing, the Court denied the FDIC's motion to reconsider Judge Jackson's prior denial of the agency's motion to dismiss Count VI, but the Court granted the FDIC's motion as to Count II. (Mot. for Recons. Hr'g Tr. at 54, 56, Nov. 22, 2004.) The parties thereafter settled all remaining counts with the exception of Count VI. Discovery was conducted as to that count only and, pursuant to the agreement of the parties and the Court's order dated February 22, 2006, the issues of the FDIC's liability for conversion and damages have been bifurcated. *Bank of N.Y. v.*

*FDIC*, No. 03-1221, Min. Order (D.D.C. Feb. 22, 2006).  The pending cross-motions for

judgment on Count VI are therefore limited to liability only.

The parties have now moved, pursuant to Federal Rule of Civil Procedure 52(a), for

findings of fact, conclusions of law, and entry of final judgment on Count VI.  BNY asks the

Court to find that the FDIC receiver unlawfully converted monies to which the Noteholders were

entitled by operation of Article V, § 5.01 the Master Indenture, when the FDIC refused to honor

the early amortization provision of the Master Indenture upon being appointed as NextBank's

receiver on February 7, 2002.  Although the parties agree this provision provides that upon

appointment of the FDIC as receiver the notes will enter early amortization– –such that almost all

payments from credit card holders on outstanding accounts receivable will immediately be

directed away from the securitization's revolving system and used to repay the

Noteholders– –they vigorously dispute whether the FDIC can enforce the Master Indenture

without regard to the ipso facto clause.

The resolution of this dispute depends on whether NextBank "entered into" the Master

Indenture within the meaning of Section 1821(e)(12)(A).  According to the FDIC, this is a

question of statutory construction, whereas BNY takes the position that it is a question of

contract law and thus is governed by the parties' intent.  As explained herein, the Court finds that

BNY's position is premised on a misreading of the statute.  However, even if one were to look to

contract law or to facts bearing on the parties' intent, BNY's argument fails as a matter of both

law and fact.

## ANALYSIS

**I.     Statutory Interpretation Approach**

**A.     Statutory Framework**

Under FIRREA, the FDIC receiver has broad powers to resolve the affairs of a failed

depository institution. *See, e.g.*, *Adagio Inv. Holding Ltd. v. FDIC*, 338 F. Supp. 2d 71, 79

(D.D.C. 2004) (discussing the FDIC's "significant," but not unlimited, "authority to resolve the

affairs of a failed bank"). One such power is the power to repudiate contracts:

> In addition to any other rights a conservator or receiver may have, the conservator or
> receiver for any depository institution may disaffirm or repudiate any contract or lease--
>
> **(A)** to which such institution is a party;
>
> **(B)** the performance of which the conservator or receiver, in the conservator's or
> receiver's discretion, determines to be burdensome; and
>
> **(C)** the disaffirmance or repudiation of which the conservator or receiver determines, in
> the conservator's or receiver's discretion, will promote the orderly administration of the
> institution's affairs.

12 U.S.C. § 1821(e)(1) (2004). A second such power is the power to "enforce any

contract . . . entered into by the depository institution notwithstanding any provision of the

contract providing for termination, default, acceleration, or exercise of rights upon, or solely by

reason of, insolvency or the appointment of a conservator or receiver." *Id.* § 1821(e)(12)(A).[6]

BNY attempts to frame the FDIC's failure to honor the Master Indenture's ipso facto

clause as an unlawful exercise of the receiver's repudiation power under Section 1821(e)(1),

which (unlike Section 1821(e)(1)(A)) requires the depository institution to have been a "party"

---

[6]The renumbered version of this provision is identical, except that Congress inserted "or
the exercise of rights or powers by" after "the appointment of." *See* 12 U.S.C. § 1821(e)(13)(A)
(2006).

and triggers the application of 12 C.F.R. § 360.6, a regulation designed to protect securitization investors.  BNY's attempt must be rejected, for the FDIC's action in this case was clearly an exercise of the repudiation power.  Although the FDIC declined to make accelerated payments under the ipso facto clause, it continued to pay Noteholders according to the regular schedule. (Def.'s Stmt. ¶ 47.)  The FDIC therefore did not "disaffirm or repudiate a contract," but ignored a single contract provision.  12 U.S.C. § 1821(e)(1); *see also FDIC v. Ernst & Young LLP*, 374 F.3d 579, 584 (7th Cir. 2004) (calling it "hard to escape the logic" of the position that Section 1821(e)(1) does not authorize the FDIC to  "cherry-pick[]" which contract provisions to repudiate).  As the FDIC itself has consistently maintained, the decision not to make accelerated payments to Noteholders was an exercise of the receiver's power to "enforce" a contract "notwithstanding any provision of the contract providing for . . . acceleration . . . upon, or solely by reason of, . . . the appointment of a conservator or receiver."  12 U.S.C. § 1821(e)(12)(A).

Accordingly, this case turns on whether the FDIC's action was lawful under Section 1821(e)(12)(A).  Both parties agree that the Master Indenture's ipso facto clause is the kind of provision Section 1821(e)(12)(A) describes.  (*See* Pl.'s Mem. in Supp. at 18.)  Their sole dispute is whether the Master Indenture was beyond the FDIC's reach because it was never entered into by NextBank.  (*See, e.g.*, *id.* at 20.)

## B.     The Definition of "Entered Into" Is Ambiguous

A threshold inquiry is whether "entered into" under FIRREA has an unambiguous meaning.  *See, e.g.*, *Wells Fargo Bank, N.A. v. FDIC*, 310 F.3d 202, 205 (D.C. Cir. 2003) ("We start our analysis, as always, by asking whether Congress has spoken to 'the precise question at issue.'" (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842

16

(1984))).  To decide, the Court must "consider the [term] at issue in context," beginning with

"traditional tools of statutory construction."  *Id.* at 206.  If Congress's intent is unambiguous, the

inquiry ends.  *See id.* at 205 ("[B]oth [the Court] and the agency must give effect to Congress's

unambiguously expressed intent.").

   BNY argues that the unambiguous, "plain and ordinary" meaning of "entered into" means

"became a 'party' to under principles of state contract law;" therefore, throughout its pleadings,

BNY conveniently equates the term "entered into" with "a party to."  (*See, e.g.*, Pl.'s Mot. at 20;

Pl.'s Resp. at 10–12, 25–27).  Accordingly, BNY would have the Court apply New York contract

law to decide whether Section 1821(e)(12)(A) covers the Master Indenture.  (*See* Pl.'s Mem. in

Supp. at 24; Pl.'s Resp. at 25–27.)  BNY's argument, however, is seriously flawed.

   As an initial matter, although BNY argues that dictionary definitions demonstrate there is

"no meaningful distinction between the terms 'be a party to' and 'enter into'" (Pl.'s Resp. at 31),

dictionaries in fact provide multiple definitions for "enter into."  As BNY suggests, the term can

mean "become a party to."  *E.g.*, *Black's Law Dictionary* 572 (8th ed. 2004); 5 *Oxford English

Dictionary* 288 (2d ed. 1989).  However, the term is also defined as "to bind oneself by (a league,

treaty, etc.)[,] to append one's name to (a bond)[,] . . . . to form part of," *id.*, and "to participate or

share in," *Webster's Third New International Dictionary* 757 (1993).

   Moreover, even accepting *arguendo* that Congress intended "entered into" to mean

"became a party to," dictionaries do not always define "party" as "party to a contract."

According to *Black's*, for example, "party" may simply mean "[o]ne who takes part in a

transaction."  *Black's Law Dictionary* 1154.  Similarly, according to *The Oxford English

Dictionary*, "party" can mean "[o]ne who takes part, participates, or is concerned in some action

or affair; a participator; an accessory."  11 *Oxford English Dictionary* 282.

More significantly, Congress's use of "entered into" in the context of FIRREA as a whole strongly suggests the term is not, as argued by BNY, synonymous with "became a party to."  *See United States v. Barnes*, 295 F.3d 1354, 1359 (D.C. Cir. 2002) (explaining that whether statutory language is plain depends on "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997))).  "Statutory provisions *in pari materia* normally are construed together to discern their meaning."  *Motion Picture Assoc. of Am., Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002).  When "different terms are used in a single piece of legislation, [a] court must presume that Congress intended the terms to have different meanings."  *Transbrasil S.A. Linhas Aereas v. Dept. of Transp.*, 791 F.2d 202, 205 (D.C. Cir. 1986) (quoting *Wilson v. Turnage,* 750 F.2d 1086, 1091 (D.C. Cir. 1984)); *see also* 2A Norman J. Singer, *Sutherland's Statutes and Statutory Construction* § 46.06, at 194 (6th ed. 2000) ("The use of different terms within related statutes generally implies that different meanings were intended.").  Whereas in Section 1821(e)(12)(A) Congress empowered the FDIC to "enforce any contract . . . entered into by the depository institution," Section 1821(e)(1) authorizes the FDIC to "repudiate any contract . . . to which such institution is a party."  Thus, viewing "entered into" in the context of Section 1821(e)(12)(A) as a whole seriously undermines BNY's argument that "entered into" unambiguously means "became a party to under state contract law."

Finally, BNY overlooks that the interpretation of a federal statute begins "with the general assumption that 'in the absence of a plain indication to the contrary, . . . Congress when it enacts a statute is not making the application of the federal act dependent on state law.'"  *Miss.*

*Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989) (quoting *Jerome v. United States*, 318 U.S. 101, 104 (1943)).  This general assumption applies in the present case, because FIRREA neither defines "entered into" nor provides any indication that Congress intended the meaning of that term to depend on state law.

For all of these reasons, the Court rejects BNY's facile attempt to equate a federal statute's requirement of "entered into" with "became a party to under state contract law."  As the FDIC has correctly argued, whether NextBank entered into the Master Indenture is a question of statutory interpretation.

### C.    The FDIC's Interpretation of FIRREA Warrants *Skidmore* Deference

The Court must next determine whether, and to what extent, the FDIC's interpretation of "entered into" warrants deference.  As an agency charged with administering FIRREA, *e.g.*, *Wells Fargo Bank*, 310 F.3d at 208, the FDIC asks the Court to award its interpretation of "entered into" the high degree of deference prescribed under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  (*See* Def.'s P. & A. at 377–38; Def.'s Reply at 1, 5.)  *Chevron* deference, however, applies only to agency interpretations bearing indicia of pronouncements carrying the force of law.  *See, e.g.*, *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters--like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law--do not warrant *Chevron*-style deference."); *Federal Election Comm'n v. NRA*, 254 F.3d 173, 184–85 (D.C. Cir. 2001) (discussing the implications of *Christensen*); *Adagio*, 338 F. Supp. 2d at 83 (citing *Christensen* for the proposition that *Chevron* deference was not warranted for letters and advisory opinions from FDIC attorneys).  Accordingly, the Court does

19

not owe *Chevron* deference to the interpretation of Section 1821(e)(12)(A) that the FDIC adopted

in its February 2002 letters to BNY.  (*See* Ltr. 2/14/02 at 1189; Ltr. 2/12/02 at 1187–88.)[7]

Instead, "because the FDIC is charged with administering this highly detailed regulatory

scheme," the Court finds that the agency's interpretation of Section 1821(e)(12)(A) is entitled to

the lesser degree of deference prescribed by *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  *Wells

Fargo*, 310 F.3d at 208.

### D.     Under the FDIC's Persuasive Interpretation of Section 1821(e)(12)(A), NextBank Entered Into the Master Indenture

*Skidmore*'s animating principle is that the "body of experience and informed judgment"

of an agency charged with administering a statute can often provide valuable guidance.  *Id.*

(quoting *Skidmore*, 323 U.S. at 140).  "The weight of [an agency's] judgment in a particular case

will depend on the thoroughness evident in its consideration, the validity of its reasoning, its

consistency with earlier and later pronouncements, and all those factors which give it power to

persuade, if lacking power to control."  *Skidmore*, 323 U.S. at 140.  Here, the validity of the

FDIC's reasoning and the consistency of its interpretation of Section 1821(e)(12)(A) persuade

---

[7]Even if the FDIC's judgment carried the force of law, the Court would be reluctant to award *Chevron* deference because the FDIC reached its judgment independently of the three other agencies that administer FIRREA.  *See Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1253 (D.C. Cir. 2003) ("[B]ecause the FDIA [Federal Deposit Insurance Act, which established the statutory regime that FIRREA amended] is administered by four separate agencies (the Comptroller of the Currency, the Board of Governors of the Federal Reserve Board, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision in the Treasury Department) the interpretation of any one of them is not entitled to *Chevron* deference."); *1185 Ave. of the Ams. Assocs. v. Resolution Trust Corp.*, 22 F.3d 494, 497 (2d Cir. 1994) ("Because FIRREA is administered by several agencies in addition to the RTC, we do not owe full *Chevron* deference to the RTC's interpretation [of Section 1821(e)]." (citation omitted)).  *But see FDIC v. Phila. Gear Corp.*, 476 U.S. 426, 439 (1986) (according *Chevron* deference to the FDIC's interpretation of "deposit" as defined in 12 U.S.C. § 1813(l)(1) when the statutory definition was "adopted wholesale from [one of] the FDIC's own regulation[s]").

the Court to adopt the agency's interpretation of "entered into."[8]

### 1.      Validity of the Agency's Reasoning

The FDIC contends that NextBank entered into the Master Indenture because (1) the transaction effected through the Master Indenture and the other transaction documents was primarily for NextBank's benefit; (2) NextBank signed the Master Indenture; (3) NextBank's board of directors approved the Master Indenture; (4) the Master Indenture obligated NextBank to perform many functions, such as "pay[ing] to the Indenture Trustee [BNY] from time to time reasonable compensation for all services rendered by the Indenture Trustee under [the Master Indenture]" (MI at 1205); (5) NextBank could enforce the Master Indenture as a third-party beneficiary; and (6) in the Administration Agreement, NextBank assumed the responsibilities of the Trust, a party to the Master Indenture.  (Def.'s P. & A. at 25–28.)  BNY disputes the relevance of these facts, emphasizing, for example, that NextBank signed the Master Indenture in a special signature block and that NextBank's board of directors approved the Master Indenture only on behalf of the trust.  (*See* Pl.'s Resp. at 13, 15.)  Under definitions of "enter into" already discussed, however, it is reasonable for the FDIC to elevate the substance of the transaction over its form and to conclude that NextBank entered into the Master Indenture.

The FDIC also persuasively argues that its interpretation of "entered into" is reasonable in light of FIRREA's legislative history.  (*See* Def.'s P. & A. at 23–24; Def.'s Reply at 2.)

---

[8]BNY attacks the thoroughness of the FDIC's construction of the statute under the guise of criticizing the FDIC's reasons for not honoring the ipso facto clause in the Master Indenture.  (*See, e.g.*, Pl.'s Mem. in Supp. at 11–17; Pl.'s Resp. at 6–9.)  That argument, however, is irrelevant.  Whether the FDIC, when appointed as receiver, made a financially sound decision in continuing to use Noteholders' capital to keep NextBank in operation is not at issue here.  Rather, the only question is whether the FDIC's legal interpretation of Section 1821(e)(12)(A) is correct as applied to the Master Indenture.

FIRREA's amendments to existing statutory provisions outlining the powers of the FDIC receiver were "designed to give the FDIC power to take all actions necessary to resolve the problems posed by a financial institution in default."  H.R. Rep. No. 101-54(I), at 415 (1989), *as reprinted in* 1989 U.S.C.C.A.N. 86, 211.  The power Congress granted the FDIC under Section 1821(e)(12)(A) "to enforce contracts that would otherwise terminate by their terms upon the appointment of a receiver" was important to this overall objective:

> The services provided under such contracts are often essential to the overall resolution of the failed institution's estate.  If the termination provisions were allowed to be effective, the service providers of some services . . . would be able to dictate terms to the receiver without any effective constraint on their power.  Conversely, providers of other services . . . would be able to escape their obligations entirely.

Technical Amendments to S. 413, Federal Deposit Insurance Corporation Act, 101st Cong. (1989), *as reprinted in* Arnold & Porter Legislative History for Specific Acts, Financial Institutions Reform, Recovery and Enforcement Act, Pub. L. No. 101-73 Mat'l 53, at ¶ 14 (1989), *available in* Westlaw, FIRREA-LH.  In granting the FDIC this power, Congress codified the common law rule that ipso facto clauses are void as contrary to public policy.  *See id.* ("This amendment enables the FDIC to continue to enforce contracts that would otherwise terminate by their terms upon the appointment of a receiver or conservator for a financial institution.  Such provisions are generally considered void under the common law as being against public policy.").  As one of FIRREA's sponsors explained on the Senate floor:

> Section 211 [Section 1821(e)] allows the FDIC as receiver to enforce contractual terms that the FDIC deems necessary for the orderly execution of its duties as receiver.  *Contracts often have a provision specifying that the contract is automatically in default on the appointment of a receiver or conservator, or similar event.  Such provisions are generally held void and section 211 merely codifies the common law rule.*

135 Cong. Rec. S2381 (daily ed. Mar. 8, 1989) (statement of Sen. Garn) (emphasis added).  This

legislative history, which clearly demonstrates that Congress strongly disfavored ipso facto clauses, lends strong support to the FDIC's decision to interpret "entered into" broadly.[9]

In response, BNY repeatedly argues that the practice of securitization depends upon the enforceability of ipso facto clauses against the FDIC.  (*See, e.g.*, Pl.'s Mem. in Supp. at 6–7; Pl.'s Resp. at 6.)  However, BNY's suggestion that investors would not purchase asset-backed securities absent a guarantee of recouping their investments at an accelerated rate upon the appointment of a receiver is belied by the clear evidence that the Noteholders here chose to buy NextBank's notes notwithstanding clear warnings that the Master Indenture's ipso facto clause might not be enforceable against the FDIC.  (*See, e.g.*, Offering Mem 12/6/00 at 396 ("[T]he FDIC may have the power . . . to prevent or require the commencement of an early amortization period . . . ."); *see also* Christensen Decl. Ex. 11 at 1040 (predicating the opinion of NextBank's counsel on assumptions that "the Documents," including the Master Indenture, "were entered into by [NextBank]" and that BNY would "not attempt to foreclose on the Receivables or the proceeds thereof after the appointment of the FDIC as conservator or receiver . . . without the existence of an event of default other than the appointment of a conservator or receiver").)

---

[9]The Bankruptcy Code similarly reflects a policy determination that ipso facto clauses are disfavored, *see* 11 U.S.C. §§ 363(l), 365(e)(1), 541(c)(1) (2006), and at least one court has considered the Bankruptcy Code instructive for purposes of interpreting Section 1821(e)(12)(A):

> [W]e find instructive the caselaw construing section 365(e)(1) of the Bankruptcy Code, 11 U.S.C. § 365(e)(1)(1988).  Courts have consistently held that section 365, an enactment which renders termination-upon-insolvency clauses unenforceable in bankruptcy, applies to leases predating the Code.  We think the analogy between the concinnuous use of Code section 365(e)(1) and FIRREA section 1821(e)(12)(A) is a powerful one.

*McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13, 17 (1st Cir. 1993) (citations omitted).

Similarly, the record belies BNY's contention that the FASB's "legal isolation" requirement means that transferors cannot receive securitization's accounting and regulatory benefits unless SPVs are separate legal entities for all purposes.  (*See* Def.'s P. & A. at 7.)  NextBank, after all, received such benefits even though the Trust Agreement provided that, "for income tax purposes, the [t]rust [would] be treated as a security device and disregarded as an entity."  (Trust at 4.) Generally accepted accounting principles permit depository institutions to take assets transferred to SPVs off their balance sheets so long as the FDIC cannot "recover or reclaim" the transferred assets in the event of a receivership.  (*See* Pl.'s Mot. Ex. B(5) at 13.)  This requirement is satisfied when the FDIC makes payments on loans backed by transferred assets at an ordinary rate; there is no requirement that the FDIC honor an ipso facto clause providing for accelerated payments upon the appointment of a receiver.

In sum, the FDIC's interpretation of Section 1821(e)(12)(A) is eminently sound.

### 2.       Consistency of the Agency's Judgment

The persuasiveness of the FDIC's judgment is further bolstered by the fact that the agency has been consistent in its interpretation of ipso facto clauses in securitization transactions.  *See Skidmore*, 323 U.S. at 140.  Both before and after the start of the NextBank receivership, the FDIC recognized that FIRREA renders ipso facto clauses unenforceable against the FDIC as receiver.  As early as 1989, general counsel for the FDIC– –John L. Douglas, who is now representing BNY in this action– –expressed the opinion that "self-help" methods devised by secured creditors could be effective only if "there was a default other than through an ipso facto provision," because "[t]he appointment of a receiver is not a default enforceable against the FDIC . . . under any contract except as specifically provided for in FIRREA."  *See* FDIC

Interpretive Letter, No. FDIC-89-49, 1989 WL 609503, at *1 (Dec. 15, 1989).  More recently, in

May 2002, the FDIC joined the OCC, the Board of Governors of the Federal Reserve System,

and the Office of Thrift Supervision in an interagency advisory opinion stating:

> Securitization documents commonly include triggers related to the insolvency of the bank
> or the appointment of the FDIC as conservator or receiver.  Provisions that trigger an
> early amortization due to the appointment of the FDIC as receiver or conservator impede
> the FDIC's ability to enforce contracts that would be beneficial to the institution or the
> receivership.  These clauses, while not necessarily subject to criticism as being unsafe or
> unsound for open institutions, may be void or voidable as being in violation of section
> 11(e)(12) [Section 1821(e)(12)(A)] of the Federal Deposit Insurance Act.

(Christensen Decl. Ex. 18 at 1208 n.2.).

The record demonstrates not only that the FDIC– –in contrast to BNY– –interpreted

Section 1821(e)(12)(A) consistently both before and after the NextBank receivership, but also

that it considered the section applicable to the Master Indenture from the earliest days of the

NextBank receivership.  (*See, e.g.*, Ltr. 2/12/02 at 1187–88.)  During those early days, based on

BNY's conduct, the FDIC did not expect BNY to attempt to enforce the ipso facto clause.  (*See*

Bd. Mins. 2/15/02 at 1204–05 (discussing "the [FDIC] staff's success in preventing the early

amortization" of the NextBank trust, and noting that BNY "[did] not appear to challenge" the

agency's interpretation of FIRREA).)  The record thus demonstrates that the FDIC's

interpretation of "entered into" is not a "*post hoc* rationalization adopted for purposes of

litigation." *Wells Fargo*, 310 F.3d at 209.

Further supporting that the FDIC's interpretation of Section 1821(e)(12)(A) has been

consistent over the years, the rating agencies, upon learning that the FDIC would enforce the

regular terms of the Master Indenture notwithstanding the ipso facto clause, did not downgrade

the NextBank notes.  (Kravitt Dep. Ex. 20; Def.'s P. & A. at 40.)  When the rating agencies did

eventually downgrade the notes, they did not list nonenforcement of the Master Indenture's ipso facto clause among their reasons for doing so.  (*See* Kravitt Dep. Ex. 20.)  Such facts tend to suggest that, when rating the NextBank notes in the first instance, the rating agencies anticipated the FDIC's interpretation of Section 1821(e)(12)(A).  Bolstering this inference is the fact that the rating agencies received copies of the opinion letters containing the assumptions that NextBank had entered into the Master Indenture and that BNY would not attempt to enforce the early amortization trigger.  (*See, e.g.*, Christensen Decl. Ex. 11 at 1040; Offering Mem 12/6/00 at 396.)

To counter this considerable body of evidence, BNY attempts to construe 12 C.F.R. § 360.6– –a regulation the agency adopted in July 2000– –as a statement that the agency would not interfere with any of the "[investor] risk-reduction elements of a securitization."  (Pl.'s Mem. in Supp. at 28; *see* Pl.'s Mot. Ex. B at 17–19 (report of industry lobbyist Jason Kravitt).)  BNY's emphasis on 12 C.F.R. § 360.6 is simply inapposite.  The regulation only addresses the receiver's power "to disaffirm or repudiate contracts"– –a power which, as already explained, is not at issue here.  In fact, the regulation expressly states it should not be read as constraining any of the receiver's other FIRREA superpowers.  *See* 12 C.F.R. § 360.6(e) (2006) ("Paragraph (b) of this section shall not be construed as waiving, limiting, or otherwise affecting the rights or powers of the FDIC to take any action or to exercise any power not specifically limited by this section . . . .").  Even if the language of the regulation itself were less than clear, which it is not, the Court would not credit the testimony of BNY's expert Jason Kravitt, on which BNY heavily relies to support its contention that the FDIC adopted 12 C.F.R. § 360.6 to assure investors that it would not exercise its FIRREA enforcement power in the securitization context.  For one, expert testimony on domestic law is not permitted because it would usurp the role of the courts.  *See,*

26

*e.g.*, *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.").  Moreover, Mr. Kravitt is a professional lobbyist "active in attempting to push industry positions with government regulators for the benefit of securitization."  (Kravitt Dep. at 31:15–17.)[10]  BNY has therefore failed to dissuade the Court from the conclusion that 12 C.F.R. § 360.6 is entirely consistent with the FDIC's judgment that the Master Indenture's ipso facto clause was unenforceable.[11]

In sum, the Court accepts the FDIC's consistent and soundly reasoned judgment that NextBank entered into the Master Indenture within the meaning of Section 1821(e)(12)(A).

## II.   Contract Law Approach

Although the Court's analysis could end there, it bears mention that this case's outcome would be the same even if BNY were correct in construing whether NextBank entered into the Master Indenture as a question of New York contract law.

---

[10]According to a 2002 *Wall Street Journal* article, Mr. Kravitt "has spent much of the past 10 years lobbying to keep regulators away from [SPVs]" such as the trust that was set up in this case.  (Kravitt Dep. Ex. 4 at 2.)

[11]Because 12 C.F.R. § 360.6 applies only to the receiver's repudiation power under Section 1821(e)(1), and not to its enforcement power under Section 1821(e)(12)(A), the FDIC need not, and does not, rely "upon any defense or argument" predicated upon the regulation. (Pl.'s Resp. at 70.)  Accordingly, this Court denies as moot BNY's request that "as a sanction for the FDIC's clear and repeated violations of its discovery obligations," by failing adequately to respond to interrogatories regarding 12 C.F.R. § 360.6, the Court "disallow any reliance by the FDIC upon any defense or argument based upon [the regulation] or its interpretation thereof, and . . . strike any pleadings of the FDIC related to any such defense or argument."  *Id.* Nonetheless, the Court also denies the FDIC's Motion for Reconsideration of Magistrate Judge's May 19, 2006 Memorandum Order on Costs.  Although the FDIC ultimately proved correct that BNY's interrogatories were irrelevant, it was obligated either to comply with the magistrate judge's September 13, 2005, order or to seek reconsideration before this Court under Federal Rule of Civil Procedure 72(a).

Under New York law, "[w]hether multiple writings should be construed as one agreement depends on the intent of the parties." *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 89 (2d Cir. 2005) (quoting *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 52–53 (2d Cir. 1993)).  The intent of the parties "is typically a question of fact." *Id.*  "If," however, "the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law." *Id.*  For example, as a matter of law, documents "[must] be read together, even though they were executed on different dates and were not all between the same parties," if the documents "form[ed] part of a single transaction and [were] designed to effectuate the same purpose." *Id.* (first alteration in original) (quoting *This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998)).

Here, the transaction documents– –as the very name suggests– –"form[ed] part of a single transaction" and were "designed to effectuate the same purpose": the securitization of NextBank's receivables. *Id.*  Accordingly, it does not matter whether the Master Indenture and the other documents were, as BNY insists, between different parties. *See id.*  Nor does it matter that the Master Indenture was executed on a different date from the Trust Agreement and the Administration Agreement. *See id.*  As a matter of law, the transaction documents must "be construed as one agreement." *Id.*

Moreover, even assuming *arguendo* that this were a question of fact, which it is not, the Court would find that NextBank and BNY intended the transaction documents to be construed together as a single agreement.  Each of the transaction documents contained repeated references to provisions of the other documents, making the documents interdependent.  (*See, e.g.*, Trust at 8; Admin. at 45, MI at 166; T&S at 91.)  The terms of the Master Indenture, for example, could

not be accomplished without the activities NextBank was responsible for performing under the Transfer and Servicing Agreement.  (*See, e.g.*, Def.'s Stmt. ¶¶ 21, 24.)

Given the substance, as opposed to the form, of this transaction, BNY's adamant protestations that NextBank and BNY intended to structure the securitization transaction so as to place the Master Indenture beyond the FDIC's reach have a decidedly hollow ring.  To begin with, BNY has provided no real evidence (as opposed to the report of a paid expert) of the parties' intent; more importantly, it has failed to offer any rebuttal to the offering memoranda, with their warnings that the Mater Indenture's ipso facto clause might be unenforceable, and the opinion letters, in which NextBank's counsel assumed BNY would not attempt to enforce the ipso facto clause.  (*See, e.g.*, Offering Mem. 4/20/01 at 876; Christensen Decl. Ex. 11 at 1040.)

Instead, BNY attempts to dismiss the opinion letters' inclusion of the Master Indenture in the definition of "the [d]ocuments" and their assumption that the documents "were entered into by [NextBank]" as "apparently a drafting error."  (Pl.'s Resp. at 20.)  Such an assertion is without evidentiary support and is, at best, disingenuous.  The record includes eleven examples of opinion letters from outside counsel sent to prospective Noteholders.  (*See* Supp. Christensen Decl. Exs. 1–8 (containing eight letters dating from February, April, May, June, August, September, October, November, and December of 2001); Christensen Decl. Ex. 11 (containing letters from January 19, 2001, and January 7, 2002); Pl.'s Mot Ex. 7 at 6–11 (containing a letter dated December 13, 2000).)  The record also includes one opinion letter drafted by general counsel for NextBank.  (*See id.* Ex. 7 at 1–4).  Ten of these letters include the Master Indenture among the documents that counsel assumed NextBank had entered into.  (*See* Supp. Christensen Decl. Ex. 8 at 1160; *id.* Ex. 7 at 1145; *id.* Ex. 6 at 1130; *id.* Ex. 5 at 1115; *id.* Ex. 4 at 1099; *id.*

Ex. 3 at 1085; *id.* Ex. 2. at 1070; *id.* Ex. 1 at 1055; Christensen Decl. Ex. 11 at 1040, 1173.)  A

single letter from NextBank's outside counsel, plus the letter from NextBank's general counsel,

do discuss "Agreements" and the Master Indenture separately.  (*See* Pl.'s Mot. Ex. 7 at 1, 7.)

Although BNY places great emphasis on the single divergent opinion letter, however, even in

this letter outside counsel "qualified" its opinion on the validity of "any document . . . as

to . . . limitations imposed by . . . receivership, conservatorship or other similar laws relating to

or affecting the rights of creditors generally and, in the case of the Bank, the rights of creditors of

national banking associations." (*Id.* Ex. 7 at 9.)  Especially in light of such a qualification, it

strains credulity for BNY to characterize the FDIC as "[g]rasping at straws" by relying on the ten

other opinion letters that unequivocally describe NextBank as having entered into the Master

Indenture.  (Pl.'s Resp. at 20.)

　　　　In any event, even if securitization-industry lawyers may have hoped to evade Section

1821(e)(12)(A) by their clever draftsmanship, such hope is beside the point.  What counts is

whether NextBank and BNY intended the transaction documents to function as one agreement,

as the evidence suggests that they did.  Thus, even if the draftsmen hoped to avoid the FDIC's

enforcement powers, the transaction's substance is clear, and it must be concluded that NextBank

entered into the Master Indenture.

## CONCLUSION

　　　　For the foregoing reasons, FIRREA sanctioned the FDIC's decision not to honor the

Master Indenture's ipso facto clause.  Accordingly, the Court will grant defendant's Motion for

Judgment on Count VI and deny plaintiff's Motion for Judgment as to Liability.